UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

JOSEPH A. BALISTRIERI,

        Plaintiff,

        v.                          Case No. 04-C-0989

EXPRESS DRUG SCREENING, LLC,
UNION PACIFIC RAILROAD COMPANY,

        Defendants.

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT UNION PACIFIC
RAILROAD COMPANY'S MOTION FOR SUMMARY JUDGMENT, AND GRANTING IN
PART AND DENYING IN PART DEFENDANT EXPRESS DRUG SCREENING, LLC'S,
MOTION FOR SUMMARY JUDGMENT

Plaintiff, Joseph A. Balistrieri, instituted this case against Union Pacific Railroad

Company (UPR) and Express Drug Screening, LLC (EDS) on October 12, 2004.  UPR was

Balistrieri's employer and EDS administered drug and alcohol testing of UPR employees.  In

his Amended Complaint, Balistrieri alleges (1) various acts of negligence by both defendants

(Counts II, III); (2) violation of the Americans with Disabilities Act, 42 U.S.C. § 12101, et. seq.,

by UPR (Count I); (3) vicarious liability against UPR for EDS's negligent conduct (Count IV);

(5) willful and wonton misconduct by UPR (Count V); and wrongful discharge by UPR (Count

VI).[1]

This court has jurisdiction over Balistrieri's federal claim pursuant to 28 U.S.C.

§ 1331 and may exercise supplemental jurisdiction over his state law claims pursuant to 28

---

[1] Count VII of the Amended Complaint sought declaratory judgment that the February 19, 2004,
Leniency Reinstatement Agreement between Balistrieri and UPR did not preclude Balistrieri from bringing the
current causes of action against UPR.  This court addressed that matter in its order dated April 6, 2006.

U.S.C. § 1367.  Now pending before the court are separate summary judgment motions filed

by EDS and UPR.

## I. BACKGROUND

Joseph Balistrieri was employed by UPR as a locomotive engineer.  (Am.

Compl. ¶ 12.)  As a consequence, his employment and pursuant to 49 C.F.R. § 20140(b),[2]

he underwent random drug and alcohol testing in May 1997, October 1999, May 2000, and

April 2003.  (Balistrieri Dep. at 7-9.)  On July 26, 2003, Balistrieri was again selected to

undergo a random drug and alcohol test.  (Am. Compl. ¶ 13.)  That test was administered by

Theretha King, owner, manager, and employee of EDS.  (*Id.* ¶ 16.)  King had administered

similar tests to Balistrieri previously.  (Balistrieri Dep. at 10-11.)

Title 49, Part 40, of the Code of Federal Regulations governs the procedures

for drug and alcohol testing for transportation employees.  Sections 40.63 and 40.193 have

been raised by the parties as applicable to this case.  Relevant portions of these sections are

the following:

> § 40.63 What steps does the collector take in the collection
> process before the employee provides a urine specimen?
>     As the collector, you must take the following steps before
> the employee provides the urine specimen:
>     . . .
>     (b) Instruct the employee to wash and dry his or her
> hands at this time.  You must tell the employee not
> to wash his or her hands again until after delivering
> the specimen to you. . . .
>     (c) Select, or allow the employee to select, an
> individually wrapped or sealed collection container
> from collection kit materials.  Either you or the

---

[2]  49 U.S.C. § 20140(b)(1)(A) requires the Secretary of Transportation to establish a drug and alcohol testing program that includes random testing of "all railroad employees responsible for safety-sensitive functions."  It is undisputed that Balistrieri fell under this regulations in his employment with UPR.

Case 2:04-cv-00989-CNC   Filed 03/31/08   Page 2 of 33   Document 102

employee, with both of you present, must unwrap or break the seal of the collection container. You must not unwrap or break the seal on any specimen bottle at this time. . . .

(d) Direct the employee to go into the room used for urination, provide a specimen of at least 45 mL, not flush the toilet, and return to you with the specimen as soon as the employee has completed the void.

(1) Except in the case of an observed or a monitored collection . . . neither you nor anyone else may go into the room with the employee.

(2) As the collector, you may set a reasonable time limit for voiding.

(e) You must pay careful attention to the employee during the entire collection process to note any conduct that clearly indicates an attempt to tamper with a specimen (e.g., substitute urine in plain view or an attempt to bring into the collection site an adulterant or urine substitute). . . .

§ 40.193 What happens when an employee does not provide a sufficient amount of urine for a drug test?

(a) This section prescribes procedures for situations in which an employee does not provide a sufficient amount of urine to permit a drug test (i.e., 45 mL of urine).

(b) As the collector, you must do the following: . . .

(2) Urge the employee to drink up to 40 ounces of fluid, distributed reasonably through a period of up to three hours, or until the individual has provided a sufficient urine specimen, whichever occurs first. It is not a refusal to test if the employee declines to drink. Document on the Remarks line of the CCF (Step 2), and inform the employee of, the time at which the three-hour period begins and ends.

. . .

(4) If the employee has not provided a sufficient specimen within three hours of the first unsuccessful

3

> attempt to provide the specimen, you
> must discontinue the collection, note
> the fact on the "Remarks" line of the
> CCF (Step 2), and immediately notify
> the DER.

The July 26, 2003, testing consisted of a Breathalyzer test and a urine screening. (Am. Compl. ¶ 16.) The urine sample was to be collected in a women's bathroom at UPR's Butler's Freight Yard in Milwaukee, Wisconsin. (Am. Compl. ¶¶ 15, 21) The bathroom consisted of two rooms: a locker room area and a bathroom area, separated by a door. (Nahulak Dep. at 38.) Inside the bathroom area were a sink and one toilet enclosed by a stall with a door. (Balistrieri Dep. 19-20.)

Testing began at 8:00 a.m. with Balistrieri's breathalyzer test conducted at about 8:04 a.m. (Am. Compl. ¶ 15, 17.) Around 8:10 a.m., King asked Balistrieri if he was ready to provide a urine sample, to which he replied he was not. (*Id.* ¶ 18.) King then informed him that he had three hours to provide a urine sample, (Yakala Aff. Ex. 4 at 185), and that he should let her know when he is ready, (Am. Compl. ¶ 18). Balistrieri then went to the Yard Master's office, in the same building, for a cup of coffee. (Balistrieri Dep. 32-33.) Around 10:00 a.m., King approached Balistrieri, in the nearby lunchroom, and asked if he was ready to provide a urine sample. (Bishof Aff. Ex. 4 at 209-10.) He responded that he was not ready and asked King if she had "anything to do that day." (*Id.*) She replied that she had a family function to attend. (*Id.*)

At about 10:30 a.m., Balistrieri returned to the bathroom area and informed King that he had to urinate. (Balistrieri Dep. 45.) At that time, King provided Balistrieri a collection container. (Am. Compl. ¶ 19, Balistrieri Dep. 30.) Balistrieri then went into the toilet stall. King gave some general instructions to Balistrieri while he was in the stall. (Balistrieri Dep. 48.)

4

This attempt was unsuccessful.  (*Id.* at 52.)  Balistrieri then exited the stall; King was in the restroom when he exited.  (*Id.*)  He proceeded to the nearby lunchroom and drank water.  (*Id.* at 53.)  While in the lunchroom, Balistrieri and his supervisor, John Nahulak, discussed the testing.  (*Id.*)  At about 10:56 a.m., Nahulak warned Balistrieri that he had only fifteen minutes left to provide a urine sample.  (Pl.'s Br. in Opp. to UPR Mot. for Summ. J. 3.)  After that conversation, Balistrieri returned to the bathroom area and made a second attempt to provide a urine sample; again without success.  Balistrieri left the stall, returned to the lunchroom for more water, and after a few minutes, returned a third time to the restroom.  (Balistrieri Dep. at 59-60.)  While he was making his third attempt, he overheard King and Nahulak talking, but was not sure if they were in the bathroom or right outside the door.  Nahulak then stated to Balistrieri "[y]ou have six minutes.  If you don't' go, you are going to be fired."  (*Id.* at 61.)

At 11:10 a.m., King notified Balistrieri that the testing period ended and that his failure to provide a sample was considered a refusal.[3]  (Am. Compl. ¶ 26.)  Following the testing, Balistrieri received a Notification of Certificate Suspension from his supervisor at UPR for non-compliance with FRA regulations due to his failure to provide a urine sample.  (*Id.* ¶ 28.)  On July 31, 2003, he received a Notice of Formal Investigation from UPR, (*Id.* ¶ 31), and on September 12, 2003, a formal investigation was conducted, (*Id.* ¶ 32).  During that period, Balistrieri saw Dr. Basil Jackson, who, on August 8, 2003, concluded that Balistrieri suffers from "shy bladder syndrome."  (Balistrieri Aff. ¶ 17.)

On September 20, 2003, Balistrieri was terminated from his employment with UPR and notified that his engineer certificate was revoked for thirty days for refusing to submit

---

[3] Pursuant to 49 C.F.R. 240.119(c)(4)(iv)(A), failure to provide a urine sample is treated the same as a refusal for the purposes of suspending or revoking engineer certification.

to a federal random drug test. (Am. Compl. ¶ 33.) The decision to terminate was appealed by Balistrieri's union representative to UPR's Director of Labor Relations, Terry M. Stone, on November 4, 2003. (Stone Aff. ¶ 2 and Ex. 1). In addition, Balistrieri appealed UPR's decision to revoke his engineer certificate to the Federal Railroad Administration's (FRA) Locomotive Engineer Review Board (LERB).

On February 27, 2004, Balistrieri signed a leniency reinstatement agreement with UPR and returned to work without back pay. (Am. Compl. ¶ 69.) On June 24, 2004, the LERB, in a decision titled "Review and Determinations Concerning the Union Pacific Railroad Company's Decision to Revoke Mr. J. A. Balistrieri's Locomotive Engineer Certificate," upheld UPR's revocation of Balistrieri's certificate for refusal to take a random drug test. (Stone Aff. Ex. 2.) Balistrieri did not appeal the LERB's decision under 49 C.F.R. Part 240.

Balistrieri filed this law suit on October 12, 2004. On November 29, 2005, UPR moved for declaratory judgment, arguing that the Agreement signed by Balistrieri bars this suit. This court denied that motion on April 6, 2006. In addition, on March 31, 2006, American Family Mutual Insurance Company filed an intervenor complaint asking to be relieved of any duty to indemnify or defend its insured, EDS. This court permitted American Family to intervene on June 16, 2006, and on August 31, 2007, granted its motion for summary judgment dismissal. The defendant's now move, separately, for summary judgment against Balistrieri.

## II. DISCUSSION

Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.

6

Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party has the initial burden of demonstrating that it is entitled to summary judgment. *Id.* at 323. Once this burden is met, the nonmoving party must designate specific facts to support or defend its case. *Id.* at 322-24.

In analyzing whether a question of fact exists, the court construes the evidence in the light most favorable to the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The mere existence of some factual dispute does not defeat a summary judgment motion; however, there must be a *genuine* issue of *material* fact for the case to survive. *Id.* at 247-48.

"Material" means that the factual dispute must be outcome-determinative under governing law. *Contreras v. City of Chicago*, 119 F.3d 1286, 1291 (7th Cir. 1997). Failure to support any essential element of a claim renders all other facts immaterial. *Celotex*, 477 U.S. at 323. A "genuine" issue of material fact requires specific and sufficient evidence that, if believed by a jury, would actually support a verdict in the nonmovant's favor. Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 249. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

A.   Union Pacific Railroad Company's Motion for Summary Judgment

1. Americans With Disabilities Act Claim

In his Amended Complaint, Balistrieri claims that UPR violated the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 et seq., by "discriminating against plaintiff because of his disability, paruresis, commonly known as "shy bladder syndrome." (Am.

7

Compl. ¶ 36.) However, in responding to UPR's motion for summary judgment, Balistrieri appears to have realized critical failings in his original ADA claim. His Brief in Opposition to UPR's Motion for Summary Judgment creatively restructures the ADA claim; he now asserts that UPR (erroneously) regarded him as "disabled" due to a drug and alcohol use and then failed to reasonably accommodate that (nonexistent) disability. Both premises are addressed below.

The ADA "requires covered entities, including private employers to provide 'reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship.'" *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184 193 (2002) (*citing* 42 U.S.C. § 12112(b)(5)(A)). A "qualified individual with a disability" is defined as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." *Id.* (*citing* § 12111(8)). The word "disability" is defined as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." § 12102(2).

To be considered disabled under subsection § 12102(2)(A), the plaintiff "must initially prove that he or she has a physical or mental impairment." *Toyota Motor Mfg.*, 534 U.S. at 194. In addition, the impairment must "substantially limit" the plaintiff in a "major life activity." While no agency has been expressly authorized to interpret the term "disability" as used in the ADA, the EEOC has promulgated regulations on the subject, and courts have used these regulations as guideposts. *See id.*; *see also Squibb v. Mem'l Med. Ctr.*, 497 F.3d

8

775, 781 n.2 (7th Cir. 2007) (noting that the Seventh Circuit "continues to use the guidance provided by the regulations, while acknowledging that they cannot 'obscure the ADA's demanding standard for qualifying as disabled.'" (*quoting EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 800-01 (7th Cir. 2005)).

Under the federal regulations, a substantial limitation is one in which the individual "is unable to perform such an activity or is 'significantly restricted as to the condition, manner or duration under which [he] can perform it, as compared to an average person in the general population." *Squibb*, 497 F.3d at 781 (*quoting* 29 C.F.R. § 1630.2(j)(1)). The regulations interpret "major life activities" as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(*l*). Other considerations in deciding whether a person is disabled under the ADA include "'the nature and severity of the impairment, the duration and expected duration of the impairment, and the permanent or long term impact or the expected permanent or long term impact of or resulting from the impairment.'" *Kampmier v. Emeritus Corp.*, 472 F.3d 930, 937 (7th Cir. 2007) (*quoting* 29 C.F.R. § 1630.2(j)(2)(i)-(iii)).

Applying these provisions to the case at hand, the court cannot conclude that Balistrieri's shy bladder syndrome qualifies him as disabled under § 12102(2)(A) of the ADA. There is no evidence in the record that the condition limits significantly his ability to care for himself, perform manual tasks, or engage in other major life activities. Balistrieri appears to acknowledge, as his Brief in Opposition to UPR's Motion for Summary Judgment makes no reference to "shy bladder syndrome" as a disability under the ADA, and he provides no support for such a proposition. (Pl.'s Br. in Opp. to UPR Mot. for Summ. J. 6.)

9

However, as hinted above, Balistrieri's new strategy asserts that he qualifies as disabled under ADA § 12102(2)(C). Under that provision, "individuals who are 'regarded as' having a disability are disabled within the meaning of the ADA." *Sutton v. United Air Lines*, 527 U.S. 471, 489 (1999). An individual may qualify under § 12102(2)(C) if "(1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, non-limiting impairment substantially limits one or more major life activities." *Sutton*, 527 U.S. at 489. In other words, the defendant must have an erroneous belief that the plaintiff has a substantial limiting impairment when (1) the individual does not have such an impairment, or (2) the individual has an impairment but it is not so limiting. *See id.* The Supreme Court has observed that the purpose of this subsection was to "cover individuals rejected from a job because of the myths, fears and stereotypes associated with disabilities." *Id.* at 489-90 (*quoting* 29 C.F.R. App. § 1630.2(*l*)).

Balistrieri submits that "the actions of the defendant against the plaintiff are those resulting from a clear belief that Mr. Balistrieri was a drug and/or alcohol user. When in fact he was not." (Pl.'s Br in Opp. to UPR's Mot. for Summ. J. 7.) He further asserts that § 12114(b)(3) protects him under these circumstances. That section provides that individuals "erroneously regarded as engaging in [illegal drug] use, but [] not engaging in such use" are not excluded from the definition of qualified individual with a disability under the Act. He argues that if UPR "would have made a reasonable accommodation to the plaintiff regarding the testing of drugs, defendant would have gotten proof that plaintiff was drug and alcohol free."

10

Assuming for the moment that UPR treated Balistrieri as a substance abuser, Balistrieri still must qualify as an individual with a disability to be protected under the ADA. Indeed, he provides no rationale for how being tagged as a substance abuser qualifies him as disabled or how his failure to provide a urine sample is based on a disability.[4] Having an erroneous belief that an individual is a substance abuser is not itself a violation of the ADA; UPR had the responsibility and authority to test Balistrieri for substance use and abuse, as sanctioned by the ADA. *See* § 12114(e).[5] As there is no argument that Balistrieri is actually "disabled" or regarded as "disabled" under the ADA, his ADA claim is dismissed.

### 2. State Law Tort Claims

#### a. Preemption of Tort Claims by the Federal Railroad Safety Act

UPR asserts that Balistrieri's common law claims of negligence (Count II), negligence through vicarious liability (Count IV), willful and wonton misconduct (Count V), and wrongful discharge (Count VI) are preempted by the Federal Railroad Safety Act (FRSA). "FRSA was enacted in 1970 to promote safety in all areas of railroad operations and to reduce railroad-related accidents and to reduce deaths and injuries to persons. . . ." *CSX*

---

[4] The ADA provides that "the term 'qualified individual with a disability' shall not include any employee or applicant who is currently engaging in the illegal use of drugs, when the covered entity acts on the basis of such use." § 12114(a). Further, even if substance abuse was a ground for disability, Balistrieri does not argue that his inability to provide a urine sample was related to such a disability. *Cf. Buckley v. Consolidated Edison Co. of N.Y.*, 155 F.3d 150 (2nd Cir. 1998).

[5] 42 U.S.C. § 12114(e) provides:
(e) Transportation employees. Nothing in this title shall be construed to encourage, prohibit, restrict, or authorize the otherwise lawful exercise by entities subject to the jurisdiction of the Department of Transportation of authority to—
(1) test employees of such entities in, and applicants for, positions involving safety-sensitive duties for the illegal use of drugs and for on-duty impairment by alcohol; and
(2) remove such persons who test positive for illegal use of drugs and on-duty impairment by alcohol pursuant to paragraph (1) from safety-sensitive duties in implementing subsection (c).

11

*Transp., Inc. v. Easterwood*, 507 U.S. 658, 662 (1993); *see also* 49 U.S.C. § 20101. Under

the FRSA, the Secretary of Transportation is given broad authority to "prescribe regulations

and issue orders for every area of railroad safety." 49 U.S.C. § 20103. Section 20140 of the

FRSA authorizes the Secretary to "prescribe regulations and issue orders . . . related to

alcohol and controlled substances used in railroad operations." These regulations permit

random and periodic testing of all railroad employees in safety-sensitive positions for use of

controlled substances and alcohol. § 20140(b)(1)(A), (2).

The extent that the FRSA preempts state law is governed by § 20106 which

provides as follows:

> § 20106. Preemption
> (a) National uniformity of regulation.
>> (1) Laws, regulations, and orders related to railroad safety and laws, regulations, and orders related to railroad security shall be nationally uniform to the extent practicable.
>> (2) A State may adopt or continue in force a law, regulation, or order related to railroad safety or security until the Secretary of Transportation (with respect to railroad safety matters), or the Secretary of Homeland Security (with respect to railroad security matters), prescribes a regulation or issues an order covering the subject matter of the State requirement. A State may adopt or continue in force an additional or more stringent law, regulation, or order related to railroad safety or security when the law, regulation, or order—
>>> (A) is necessary to eliminate or reduce an essentially local safety or security hazard;
>>> (B) is not incompatible with a law, regulation, or order of the United States Government; and
>>> (C) does not unreasonably burden interstate commerce.
>
> (b) Clarification regarding State law causes of action.

(1) Nothing in this section shall be construed to preempt an action under State law seeking damages for personal injury, death, or property damage alleging that a party—

(A) has failed to comply with the Federal standard of care established by a regulation or order issued by the Secretary of Transportation (with respect to railroad safety matters), or the Secretary of Homeland Security (with respect to railroad security matters), covering the subject matter as provided in subsection (a) of this section;

(B) has failed to comply with its own plan, rule, or standard that it created pursuant to a regulation or order issued by either of the Secretaries; or

(C) has failed to comply with a State law, regulation, or order that is not incompatible with subsection (a)(2).

(2) This subsection shall apply to all pending State law causes of action arising from events or activities occurring on or after January 18, 2002.

The doctrine of preemption derives from the Supremacy Clause of the U.S. Constitution. State law is preempted when Congress expressly declares its intention to preempt state law; when Congress, by implication through the structure and purpose of the law, demonstrates its intent to preempt state law; and where state law directly conflicts with federal law such that a party cannot comply with both laws. *See English v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990). Federal regulations can preempt state law if the agency issuing the regulations is acting within the scope of its authority. *Fid. Fed. Savings & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982). Further, legal duties imposed on railroads by the common law may be preempted if "federal regulations substantially subsume the subject matter of the state law." *Easterwood*, 507 U.S. at 664. However, "in the interest of avoiding

13

unintended encroachment on the authority of the states," courts are reluctant to find preemption in a federal statute relating to subjects traditionally governed by state law. *Id.* This is particularly true where, as here, express savings clauses surround a preemption clause. *See id.*

In determining whether the state law is preempted, "the ultimate touchstone is congressional purpose." *Fifth Third Bank ex rel. Trust Officer v. CSX Corp.*, 415 F.3d 741, 746 (7th Cir. 2005). If the statute includes an express preemption clause, the court's focus in statutory construction is on the plain language of the clause. *Easterwood*, 507 U.S. at 664.

Federal courts have wrestled with the scope of FRSA's preemption clause over state common law claims. *See e.g.*, *Lundeen v. Canadian Pac. Ry. Co. (Lundeen I),* 447 F.3d 606, 613 (8th Cir. 2006); *Chapman v. LabOne*, 390 F.3d 620, 623 (8th Cir. 2004); *Peters v. Union Pacific R.R. Co.*, 80 F.3d 257 (8th Cir. 1996); *Frank v. Delta Airlines Inc.*, 314 F.3d 195 (5th Cir. 2002) (considering similar preemption issues related to FAA regulations); *Fifie v. Cooksey*, 403 F. Supp. 2d 1131, 1135 (M.D. Fla. 2005). In response to courts' varying interpretation of the preemption clause, Congress recently added subsection (b) to the statute in August 2007 through the Implementing Recommendations of the 9/11 Commission Act of 2007, Pub. L. No. 110-53, Title XV, Subtitle B, § 1528, 121 Stat. 453.[6] The Conference Report for the Act notes that subsection (b) was added to "clarify the intent and interpretations of the existing preemption statute and to rectify the Federal court decisions related to the Minot, North Dakota accident that are in conflict with precedent." H.R. Rep. No. 110-259, at 351 (2007). "It clarifies that 49 U.S.C. 20106 does not preempt State law causes of action

---

[6] This provision was added by Congress after the parties submitted their briefs on this motion.

where a party has failed to comply with the Federal standard of care established by a regulation or order," and "nothing in 49 U.S.C. 20106 creates a Federal cause of action on behalf of an injured party or confers Federal question jurisdiction for such State law causes of action." *Id.*

The court decisions referred to by Congress relate to a freight train derailment on January 18, 2002, near the city limits to Minot, North Dakota. The derailment resulted in the release of over 220,000 gallons of anhydrous ammonia into the surrounding environment. *See, e.g.*, *Lundeen I.,* 447 F.3d 606 (finding FRSA preempts state law negligence claims); *Lundeen v. Canadian Pac. Ry, Co. (Lundeen II)*, 2007 U.S. Dist. LEXIS 7839, at * 2-3 (D. Minn. Feb. 2, 2007) (same); *Mehl v. Canadian Pac. Ry.*, 417 F. Supp. 2d 1104 (D.N.D. 2006) (same).

In *Lundeen I*, the Eighth Circuit concluded that the FRSA completely preempted plaintiffs' negligence claims with respect to the derailment and toxic release, and remanded the case to the district court. At issue were federal regulations that established

> a specific inspection protocol including how, 49 C.F.R. § 213.233(b), when, §§ 213.233(c) & .237(a)-(c), and by whom, §§ 212.203, 213.7 & .233(a), track inspections must be conducted; the regulations establish a national railroad safety program intended to promote safety in all areas of railroad operations, § 212.101(a); federal and state inspectors determine the extent to which the railroads, shippers, and manufacturers have fulfilled their obligations with respect to, among other things, inspection, § 212.101(b)(1); and railroads face civil penalties for violations, § 213 App. B.

447 F.3d at 614. The court found that plaintiffs' negligent inspection claims were preempted because "it is both clear the regulations at issue are intended to prevent negligent track

inspection nationally and contain no savings clause (so there is thus no indication the FRA meant to leave open a state law cause of action)." *Id.*

The Eighth Circuit contrasted its decision in *Lundeen I* with its previous holding in *Chapman v. LabOne*, 390 F.3d 620. In *Chapman*, the court declined to find preemption of common law claims alleging negligent drug testing because "the applicable statute and regulations concerning drug testing do not establish an intent to preempt the substantive common law at issue." *Lundeen I*, 447 F.3d at 613. Key to its holding in *Chapman* was an anti-waiver provision [49 C.F.R. § 219.11(d)] providing for a "private right of action for a person aggrieved by negligence in the analysis of a drug test, and the absence of an alternative cause of action militates against a finding of complete preemption." *Id.* (*quoting* 390 F.3d at 629). The lack of such an anti-waiver provision in the regulations governing railroad track inspections demonstrated no such solicitude for state law. *Id.* at 614.

Here, the plain language of § 20106(b) and the legislative history indicate Congress' intent to preserve certain state common law causes of action. Further, the standard of care established in the regulations governing drug and alcohol testing appears to be ordinary negligence under state law. For example, 49 C.F.R. § 219.11(d) prevents an employer from requiring an employee to "waive liability with respect to negligence on the part of any person participating in the collection, handling, or analysis of the specimen or to indemnify any person for the negligence of others."[7] Further, 49 C.F.R. § 40.27, provides that "[An employer] must not require an employee to sign a consent, release, waiver of liability, or

---

[7] See also *Chapman*, 390 F.3d 627 ("We agree with the Ninth Circuit that 'negligence is a state common law tort, and it would make no sense for the regulation to prohibit requiring the employee to waive negligence claims if those claims were preempted and could not be made.'" (quoting *Ishikawa v. Delta Airlines, Inc.*, 343 F.3d 1129, 1133, as amended, 350 F.3d 915 (9th Cir. 2003)); *see also Drake v. Lab. Corp. of Am. Holdings*, 290 F. Supp. 2d 352, 373 (E.D.N.Y. 2003).

indemnification agreement with respect to any part of the drug or alcohol testing process covered by this part (including, but not limited to, collections, laboratory testing, MRO and SAP services.)". This conclusion is further supported by Congress' intent to "rectify" the decisions in *Lundeen*, *Mehl*, and similar cases that found federal preemption of state law negligence claims under the FSRA, and its express instruction that no alternative federal cause of action exists. *See* H.R. Rep. No. 110-259, at 351 (2007).

UPR argues that, should this court follow *Chapman* and hold that claims related to drug testing are not preempted by federal law, employers are nonetheless excluded from liability under 49 C.F.R. § 219.11(d). It is true that § 219.11(d)'s prohibition on liability waivers focuses on "any person participating in the collection, handling, or analysis of the inspection"; and the *Chapman* court, in dicta, recognized a distinction between employers and others involved in the collection process. *See* 390 F.3d at 628 (noting that the anti-waiver provision "is directed to negligence on the part of others involved in the collection, handling, and analysis of specimens"); *Smeltzer v. Medtox Labs.*, 2006 WL 2095468, at *7 n.11 (D. Minn. July 27, 2006) (noting in a footnote that *Chapman* "excepted from consideration whether 'an employer is vicariously liable for a laboratory's improper testing procedures'"). However, given (1) Congress' intent that the claims at issue are not preempted by federal law, (2) the Supreme Court's guidance that courts should be reluctant to find federal preemption of subjects traditionally governed by state law (which includes negligence claims), and (3)

Case 2:04-cv-00989-CNC   Filed 03/31/08   Page 17 of 33   Document 102

regulations imposing liability on the employer, *see* 49 C.F.R. §§ 40.11,[8] 40.15,[9] 40.27, this court is reluctant to find that employers cannot, based on federal preemption, be held liable for negligence related to drug and alcohol testing.

Because Balistrieri asserts causes of action "under State law seeking damages for personal injury[10] . . . alleging that a party—(A) has failed to comply with the Federal standard of care established by a regulation or order issued by the Secretary of Transportation," § 20106(b), his claims are not subject to federal preemption by the FSRA.

### b. Preemption of Claims Due to Failure to Exhaust Administrative Remedies

UPR next alleges that Balistrieri's claims should be dismissed because he "failed to exhaust available administrative remedies—not once but twice—in bargaining away any labor claim under the Railway Labor Act (RLA) and then refusing to appeal the FRA's LERB's June 17, 2004 Decision relating to his certification claim." (Def. UPR's Br. in Supp. Mot. Summ. J. 20.) However, neither assertion supports summary judgment in UPR's favor.

---

[8] 49 C.F.R. § 40.11 states "(a) As an employer, you are responsible for meeting all applicable requirements and procedures of this part. (b) You [the employer] are responsible for all actions of your officials, representatives, and agents (including service agents) in carrying out the requirements of the DOT agency regulations."

[9] 49 C.F.R. § 40.15(c) states "You [the employer] remain responsible for compliance with all applicable requirements of this part and other DOT drug and alcohol testing regulations, even when you use a service agent." Of note, while this subsection further notes that if the employer violates "this part or other DOT drug and alcohol testing regulations because a service agent has not provided services as our rules require, a DOT agency can subject you to sanctions," such a provision does not therefore mean an employer is excused from negligence claims.

[10] The court does not doubt that Balistrieri presents a claim for personal injury. According to Black's Law Dictionary, common usage of the term "personal injury" implies a broad range of injuries, "including any injury which is an invasion of personal rights, and in this signification it may include such injuries to the person as libel or slander . . . and mental suffering." Black's Law Dictionary 786 (6th ed. 1991). In all relevant claims, Balistrieri asserts that he has suffered mental suffering and loss of income. (Compl. 8-13.)

18

First, UPR points out that under the FSRA, 49 C.F.R. Part 240, Subpart E sets forth a three-level dispute resolution system "in which a person denied engineer certification may obtain a fresh determination by the FRA of whether a railroad's decision was correct." *Carpenter v. Mineta*, 432 F.3d 1029, 1031 (9th Cir. 2005). UPR argues that Balistrieri failed to exhaust his FSRA administrative claims because he did not appeal the June 17, 2004, decision of the LERB, which affirmed UPR's finding of a violation pursuant to 49 C.F.R. Part 240.119.[11]

In general, "[w]here relief is available from an administrative agency, the plaintiff is ordinarily required to pursue that avenue of redress before proceeding to the courts; and until that recourse is exhausted, suit is premature and must be dismissed." *Peters v. Union Pac. R.R.*, 80 F.3d 257, 262 (8th Cir. 1996). Part 240 of title 49 of the Code of Federal Regulations governs the qualifications and certification of locomotive engineers. Hence, it governs the eligibility of an engineer to hold a certificate based on compliance with alcohol and drug testing procedures, see § 240.119, and dispute resolution procedures, see § 240.401-.411. Section 240.403 provides that an employee may obtain review of a "railroad's decision to deny certification, deny recertification, or revoke certification," by filing a petition with the LERB. Following the decision of the LERB, a party may appeal by requesting an administrative hearing under § 240.409. Failure to request a hearing within the applicable time makes the determination of the LERB the final agency decision. § 240.407.

---

[11] 49 C.F.R. § 240.119(c)(iv)(4) provides that "In the case of a refusal or failure to provide a breath or body fluid sample for testing under the requirements of part 219 of this chapter when instructed to do so by a railroad representative, the refusal or failure shall be treated for purposes of ineligibility under this paragraph in the same manner as a violation of—(A) § 219.102, in the case of a refusal or failure to provide a urine specimen for testing."

19

For support, UPR points to *Peters v. Union Pacific Railroad Co.*, 80 F.3d 257. In *Peters*, the Eighth Circuit dismissed Peters' state law conversion claim because it was preempted by the FSRA and he failed to exhaust administrative remedies under Part 240. In that case, UPR termimated Peters' employment for violating federal regulations and suspended his engineer certification for one month. Peters' union appealed the decision under the collective bargaining agreement, and six months later, pursuant to a leniency reinstatement agreement, Peters was reissued his certificate and returned to work. 80 F.3d at 261. He then sued UPR for conversion based on its refusal to return his certification after the one-month suspension period. The court found that the FSRA governs engineer certification, and Peters' claim was predicated on a certification dispute; thus, the claim was preempted by the FSRA. *Id.* at 262. Thus, the court upheld the district court's dismissal of the action because Peters failed to exhaust the dispute resolution procedures under Part 240 which are set up to handle certification disputes. *Id.* at 262-63.

Here, Balistrieri sought relief from the LERB prior to executing the leniency reinstatement agreement with UPR. On June, 17, 2004, the LERB issued a decision affirming UPR's finding that Balistrieri violated Part 240 by failing to provide a urine sample and affirming UPR's decision to revoke his certification. Although Balistrieri had executed the leniency reinstatement agreement and his employment and certification had been restored by the time the LERB issued its decision, it is undisputed Balistrieri did not pursue the appeal procedures available under Part 240.

The circumstances of *Peters* are, however, sufficiently distinguishable from this case such that UPR cannot succeed on its preemption/exhaustion argument. Most important, while both cases involve questions of engineer certification, Balistrieri's state law claims,

unlike Peters' conversion of certificate claim, are not preempted by the FSRA. Anti-waiver and employer liability clauses associated with drug and alcohol testing, including 49 C.F.R. §§ 219.11(d), 40.27, 40.15(c) and 40.11, recognize an employee's private right of action for claims arising from testing procedures. Further, the recently added 49 U.S.C. § 20106(b) specifically saves from preemption state law causes of actions alleging personal injury for a party's failure "to comply with the Federal standard of care established by a regulation or order issued by the Secretary of Transportation." To preempt Balistrieri's claims based on his failure to exhaust 49 C.F.R. Part 240 administrative remedies would require reading an exception for railroad employees into § 20106(b) and ignoring the anti-waiver and employer liability clauses provided in the federal regulations governing drug and alcohol testing.

UPR's second asserted grounds for barring Balistrieri's claims based on failure to exhaust administrative remedies is that employer-employee drug testing programs are "minor disputes" under the RLA and subject to mandatory arbitration before the National Railroad Adjustment Board (NRAB). 45 U.S.C. § 153. Balistrieri did not seek review of his labor claims by the NRAB and according to UPR, his state law claims must be dismissed. Additionally, Balistrieri admitted he agreed to withdraw his RLA claims pursuant to the leniency reinstatement agreement. (Pl.'s Mot. for Leave to File First Am. Compl. ¶ 7.)

"Congress enacted the RLA, 45 U.S.C. § 151 et seq., to prevent disruptions of interstate commerce caused by labor disputes. 45 U.S.C. § 151a. The Act facilitates that legislative purpose by imposing mandatory procedures for resolving disputes between railroads and their employees involving collective bargaining ('major disputes') or grievances ('minor disputes')." *National R.R. Passenger Corp. v. Int'l Ass'n of Machinists & Aerospace Workers*, 915 F.2d 43, 49 (1st Cir. 1990). Minor disputes exist "when the resolution of the

plaintiff's claim requires interpretation of the CBA [collective bargaining agreement]." *Brown v. Ill. Cent. R.R. Co.* 254 F.3d 654, 658 (7th Cir. 2001); *see also Coker v. Trans World Airlines, Inc.*, 165 F.3d 579, 583 (7th Cir. 1999) (stating that "[t]he distinguishing feature of a minor dispute is that the dispute can be conclusively resolved by interpreting the existing CBA"). If a claim is properly characterized as a minor dispute, it is subject to arbitration under the RLA. *Id.* However, if a plaintiff's claim "is grounded upon rights which stem from some source other than the CBA (such as state law), the claim will be preempted if it cannot be adjudicated without interpreting the CBA, or if it can be "conclusively resolved" by interpreting the CBA. *Id.* (*citing Haw. Airlines v. Norris*, 512 U.S. 246, 261-62 (1994)); *see also Norris*, 512 U.S. at 262 ("[E]ven if dispute resolution pursuant to a collective bargaining agreement, on the one hand, and state law, on the other, would require addressing precisely the same set of facts, as long as the state-law claim can be resolved without interpreting the agreement itself, the claim is independent of the agreement. . . .")

For support, UPR points to *Milam v. Herrlin*, 819 F. Supp. 295, in which the district court found the plaintiff's state tort law claims preempted by the RLA. In that case, the plaintiff was subject to random urinalysis pursuant to 49 C.F.R. § 219 and the CBA between plaintiff's union and the defendant.

> The rates of pay, rules, and working conditions of [plaintiff's] employment are governed by the collective bargaining agreement ("the Agreement") entered into between [the defendant] and [plaintiff's union], which was formed according to and is governed by the provisions of the Railway Labor Act, 45 U.S.C. §§ 151 et seq. (the "RLA"). [The defendant's] Substance Abuse Policy and [the applicable rule] of the Rules of the Operating Department ("the Department"), which restrict an employee's use of alcohol and controlled substances, are deemed by past practice to be part of [the defendant's] collective bargaining agreements.

22

*Id.* at 299.  The plaintiff was terminated following an allegedly false-positive urine test; he brought suit contending the false-positive result was due to the defendant's negligence.  The court found that the plaintiff could not prove his claims of negligence and resulting emotional distress "without referring to the terms and conditions of his employment as they are set forth in [49 C.F.R.] Part 219 and the [collective bargaining] Agreement."  Hence, the claims "could be resolved through interpretation of the existing Agreement by arbitration before the adjustment board" and were preempted by RLA.  *Id.* at 305.

          To succeed on its claim that the RLA preempts Balistrieri's state tort claims, UPR must show that Balistrieri was covered by a collective bargaining agreement, that the RLA governed dispute resolution under the agreement; and that Balistrieri could not prove his claim without reference to the terms of the agreement.  Unlike the litigants in *Milam*, neither party in this case presents specifics of an applicable CBA that governs (or does not govern) the claims at issue.  To adopt UPR's position would require this court to assume the content of the applicable CBA.  *See* 49 C.F.R. 219.104 ("Nothing in this part may be deemed to abridge any additional procedural rights or remedies not inconsistent with this part that are available to the employee under a collective bargaining agreement the Railway Labor Act, or (with respect to employment at will) at common law with respect to the removal or other adverse action taken as a consequence of a positive test result in a test authorized or required by this part.").  Nowhere in UPR's Proposed Findings of Fact, Brief in Support of Motion for Summary Judgment, or Reply Brief in Support of Motion for Summary Judgment does it point to specific provisions of an applicable collective bargaining agreement or provide citations to the record such that the court may interpret the CBA, as required for preemption

Case 2:04-cv-00989-CNC    Filed 03/31/08    Page 23 of 33    Document 102

under *Hawaii Airlines v. Norris*, 512 U.S. at 261-62.[12]  *See also Elgin, Joliet & E. Ry. Co. v. Burley*, 325 U.S. 711, 723 (1945) ("[A minor dispute under the RLA] relates either to the meaning or proper application of a particular provision [of a collective bargaining agreement] with reference to a specific situation or an omitted case.").  Because RLA preemption requires interpretation of the collective bargaining agreement, and UPR does not fulfil its burden to present evidence for this court to determine that the claims at issue could be resolved by interpreting the applicable CBA, Balistrieri's tort claims may not be dismissed based on RLA preemption.

B. Express Drug Screening, LLC's Motion for Summary Judgment

Of the multiple claims included in Balistrieri's amended complaint, only Count III is specifically directed at EDS.  Count III of the amended complaint charges EDS with negligence in violating its duty of care under the circumstances and causing Balistrieri injury.  Balistrieri argues that breach of King's duty of care caused his failure to produce a urine specimen, which foreseeably resulted in his loss of employment.

_____

[12]  UPR instead notes the following:

"Nowhere within his opposition brief does Balistrieri contend that his challenge to the drug testing policies was not governed by the RLA.  Balistrieri's violation of 49 C.F.R. Part 240 (the impetus for the Level 5 discipline) can be "conclusively resolved" by interpreting the CBA because Balistrieri has not presented an argument illustrating how any one of his common law claims hinge on anything other than the established drug testing policies."

(Def. UPR's Rep. Br. 10).  It further notes that  that Balistrieri admits he was subject to random testing in accordance with his "terms of employment."   However, as noted above, UPR provides no reference or record citation to the applicable collective bargaining agreement provisions, which is necessary for RLA preemption. The decisions cited by UPR in its Brief in Support of Motion for Summary Judgment reference applicable provisions of a governing collective bargaining agreement in concluding that a dispute is a "minor dispute" subject to RLA arbitration.  *See, e.g., Allied Pilots Ass'n v. Am. Airlines, Inc.*, 898 F.2d 462, 464 (5th Cir. 1990); *Local Union No. 2000, Int'l Bhd. of Teamsters, AFL-CIO v. Nw. Airlines*, 21 F. Supp. 2d 751, 754 (D. Mich. 1998); *Taylor v. Am. Airlines*, 943 F. Supp. 1164, 1168 (D. Mo. 1996).

24

The court is mindful that in Wisconsin, "summary judgment is rarely appropriate in negligence cases due to the multitude of factual issues which need to be resolved by the jury." *Jakubiec v. Cities Service Co.*, 844 F.2d 470, 473 (7th Cir. 1988); *Gracyalny v. Westinghouse Elec. Corp.*, 723 F.2d 1311, 1316 (7th Cir. 1983) ("Thus, summary judgment is rarely appropriate in negligence cases." (*citing Ceplina v. S. Milwaukee Sch. Bd.*, 73 Wis. 2d 338, 343, 243 N.W.2d 183, 185 (1975)). To grant summary judgment on a Wisconsin negligence claim,

> the court "must be able to say that no properly instructed, reasonable jury could find, based on the facts presented, that [the defendants] failed to exercise ordinary care." The concept of negligence is peculiarly elusive, and requires the trier of fact to pass upon the reasonableness of the conduct in light of all the circumstances, "even where historical facts are concededly undisputed." Ordinarily, this is not a decision for the court.

*Alvarado v. Sersch*, 2003 WI 55, ¶ 29, 262 Wis. 2d 74, ¶29, 662 N.W.2d 350, ¶ 29 (internal citations omitted). With this hurdle in mind, the elements of negligence and defendant's arguments in favor of summary judgment are addressed below.

In Wisconsin, "[t]he elements of a negligence claim are: (1) the existence of a duty of care on the part of the defendant, (2) a breach of that duty of care, (3) a causal connection between the defendant's breach of the duty of care and the plaintiff's injury, and (4) actual loss or damage resulting from the injury." *Gritzner v. Michael R.*, 2000 WI 68, ¶ 19, 235 Wis. 2d 781, ¶ 19, 611 N.W.2d 906, ¶ 19 (citations omitted). "The first element, a duty of care, is established under Wisconsin law whenever it was foreseeable to the defendant that his or her act or omission to act might cause harm to some other person." *Id.* at ¶ 20, 235 Wis. 2d 781, ¶ 20, 611 N.W.2d 906, ¶ 20 (citations omitted). "At the very least, every person is subject to a duty to exercise ordinary care in all of his or her activities." *Id.*, 235 Wis. 2d

781, ¶ 20, 611 N.W.2d 906, ¶ 20 (citation omitted); *see also Stephenson v. Universal Metrics, Inc.*, 2002 WI 30, ¶ 16, 251 Wis. 2d 171, ¶ 16, 641 N.W.2d 158, ¶ 16 ("Thus, when determining the existence of a duty, the primary question we ask is not whether the defendant has a duty to take (or refrain from) certain actions, but whether the defendant's actions (or lack thereof) were consistent with the general duty to exercise a reasonable degree of care under the circumstances.")

The parties dispute whether EDS owed a duty to Balistrieri. However, as noted above, in Wisconsin "everyone owes a duty of ordinary care to all persons" under the circumstances. *See Alvarado*, 2003 WI 55, ¶ 27, 262 Wis. 2d 74, ¶27, 662 N.W.2d 350, ¶ 27.[13] With that in mind, consideration must be give to whether EDS breached a duty of ordinary care to Balistrieri. Balistrieri points to alleged violations of the applicable federal regulations governing drug and alcohol testing by EDS as evidence of negligence. Specifically, he asserts that EDS committed "one or more of the following negligent acts or omissions in violation of the Department of Transportation Urine Specimen Collection Guidelines, the FRA [Federal Railroad Administration] Compliance Manual, 49 C.F.R. § 40 et. seq., and other violations":

---

[13] Balistrieri directs the court to an Illinois court decision that held a drug testing laboratory owed a duty to the plaintiff employee based on the foreseeability and magnitude of the possible injury to the plaintiff due to negligently reported positive drug test results." *Stinson v. Physicians Immediate Care, Ltd.*, 646 N.E.2d 930, 933 (Ill. Ct. App. 1995). However, as EDS correctly points out, the Illinois duty analysis is inapposite here. Under Illinois law, existence of a duty "depends on whether the parties stood in such a relationship to one another that the law imposes an obligation on the defendant to act reasonably for the protection of the plaintiff. *Stinson*, 646 N.E.2d at 933; *see also Gouge v. Cent. Ill. Pub. Serv. Co.*, 144 Ill. 2d 535, 542 (Ill. 1991). Under Wisconsin law, "conduct is negligent if it involves a forseeable risk of harm to anyone. In Wisconsin, the doctrine of public policy, not the doctrine of duty, limits the scope of the defendant's liability." *Bowen v. Lumbermens Mut. Cas. Co.*, 183 Wis. 2d 627, 644, 517 N.W.2d 432, 439 (1994). Likewise, the court also rejects EDS's assertion that its duty is limited to UPR or the public at large, see 49 C.F.R. § 219.1 ("The purpose of this part is to prevent accidents and casualties in railroad operations that result from impairment of employees by alcohol or drugs."), as Balistrieri is asserting a claim of ordinary negligence under Wisconsin law.

I.      Failed to monitor plaintiff or designate someone to monitor him during the waiting period;

II.     Failed to begin the collection procedure until approximately 10:30 plaintiff was first given a specimen container. Instead, Ms. King started the waiting period at 8:10 a.m. and ending it at 11:10 a.m. when the waiting period should have expired at 1:30 p.m.;

III.    Continually pressured the plaintiff to urinate by 11:10 a.m. or he would fail;

IV.     Failed to give him any advice concerning drinking fluids;

V.      Being physically present in the collection room with plaintiff each time plaintiff attempted to provide a urine specimen;

VI.     Allowing a collector of opposite gender to be present at the collection site;

VII.    Allowing plaintiff's supervisor to enter the restroom and have a discussion with the plaintiff while the plaintiff was attempting to provide a urine specimen. . . .

(Am. Compl. ¶ 49.)[14]  Balistrieri states that as a direct result of these acts and omissions, he suffered loss of income, emotional distress, and other injuries. (Am. Compl. 9-10).

EDS counters these assertions as lacking a causal connection to his injury.  It submits that Balistrieri's testimony contradicts his claims, as he cannot point to a specific action by EDS that was the cause of his failure to provide a urine sample on July 26, 2003. Given the Wisconsin Supreme Court's deference for jury determinations as to breach and cause in negligence cases, see *Alvarado*, 2003 WI 55, ¶ 29, 262 Wis. 2d 74, ¶29, 662 N.W.2d 350, ¶ 29, the court will dispose only of those assertions in which the record

---

[14]  In addition, Balistrieri charges that EDS failed to comply with 49 C.F.R. § 40.63 by not requesting identification, not instructing him to empty his pockets, and not instructing him to wash his hands. (Pl.'s Mem. in Opp. to Mot. for Summ. J. 9.)  The court disposes of any arguments or potential arguments that EDS's alleged failure comply with those requirements establishes liability for negligence.  Such precautions are in place to prevent employees from subverting the testing procedures or submitting an altered sample and are immaterial to Balistrieri's claim.  Balistrieri also asserts that EDS was negligent by not "reassuring and encouraging" him during testing. (Pl.'s Mem. in Opp. 9.)  The court is unclear how could EDS should have fulfilled this alleged duty and as such refuses to entertain the idea that EDS owed such comfort to an employee.

27

demonstrates clearly that there is no genuine issue of material fact and that no reasonable jury could find for Balistrieri.

Balistrieri first contends that EDS was negligent for failing to monitor him during the sample collection period. Whether EDS failed to monitor Balistrieri is immaterial to his negligence claim. Such a requirement is designed to prevent the employee from subverting the testing procedures and submitting an altered sample. In this case, there is no issue concerning an altered urine sample as no sample was submitted.

Next, Balistrieri indicates that King failed to announce the starting of the three-hour time limit for him to provide a urine sample and that the collection period was to begin only after his first attempt to provide a sample at 10:30 a.m. This assertion finds no support in the record. Balistrieri admitted that he was asked for a urine sample at or immediately near 8:10 a.m., (Am. Compl. ¶ 18), and he acknowledged that King notified him at 8:10 a.m. that he had three hours to produce a sample, (Yakala Aff. Ex. D. at 185).[15] According to 49 C.F.R. § 40.61, which requires that when the employee arrives for testing, the tester must: "(b) Ensure that, when the employee enters the collection site, you begin the testing process without undue delay. For example, you must not wait because the employee says he or she is not ready or is unable to urinate. . . ."

Third, Balistrieri's assertion that King "continually pressured the plaintiff to urinate" also lacks support in the record. Balistrieri admitted that other than King telling him how much time he had left, he was not pressured by King. (Balistrieri Dep. 64, 76.) Because

---

[15] The transcript of the September 12, 2003, Formal Investigation on Balistrieri's suspension due to failure to produce a urine sample reveals the following exchange between J.T. Nezworski, UPR's Manager of Terminal Operations, and Balistrieri: "Question [by Nezworski to Balistrieri]: But at 8:10 a.m. you were notified, I take it by, the tester Miss King that you had three hours from 8:10 to produce a sample? Answer [by Balistrieri]: Yes."

federal regulations required Balistrieri to provide a sample within three hours, such a notification would be expected and cannot be considered unreasonable "pressure."  In addition, Balistrieri mischaracterizes the record by proffering as a fact that "King told plaintiff she was in a hurry [to complete his collection period] because she had to attend a family function." (Pl.'s Additional PPFOF ¶ 23) However, the transcript of the September 12, 2003, Formal Investigation, to which Balistrieri points to in support of this proposed fact, indicates that around 10:00 a.m., after King asked Balistrieri if he was ready to provide a sample, Balistrieri asked if she had anything to do that day.  King's reply was "Yes.  She had a family function to attend."  (Bishop. Aff. Ex. 4 at 209-10.)

Balistrieri's fourth assertion that EDS is negligent for not advising him to drink fluids, also lacks support in the record.  The record demonstrates that Balistrieri was familiar with the testing procedure because of previous testing, understood that drinking water generally facilitates urination, and he attempted to drink water for that purpose.  (*See* Balistrieri Dep. 21-22.)

Regardless, there are genuine issues of material fact as to Balistrieri's fifth, sixth, and seventh assertions that preclude granting summary judgment on those contentions. With regard to Balistrieri's fifth negligence contention, there are disputes as to when and if King was present in the restroom when Balistrieri was attempting to provide a sample.  EDS points to Balistrieri's deposition testimony that he could not state for certain that King remained in the restroom area after he shut the toilet stall door.  (Balistrieri Dep. 49, 55, 56-59.)  On this point, Balistrieri states that for his first attempt at or near 10:30 a.m., King was present in the restroom, near the sink, when he entered the stall and when and exited the stall.

29

While it is true that Balistrieri cannot claim that King did not exit the restroom area and return later, a reasonable inference, which the court must take in Balistrieri's favor, is that she remained in one place the entire time. There are similar disputed facts regarding King's whereabouts during Balistrieri's other attempts to provide a urine sample, as King testified that she was not in the restroom area during any attempts to provide a urine sample. (King Dep. 40, 49, 59.) Resolution of these questions of fact is not permissible on summary judgment.

Balistrieri's sixth claim relating to King's gender is intertwined with his fifth claim regarding her presence in the restroom. It is true that King was the collector during previous tests when Balistrieri provided a sample in the allotted time. As noted previously, it is also true that Balistrieri could not affirmatively claim that King's gender was the cause of his failure to provide a sample on July 26, 2003. However, because the surrounding circumstances are of a personal nature, the court is not willing to conclude that EDS is entitled to judgment as a matter of law on this point. Resolution of this issue requires a "trier of fact to pass upon the reasonableness of the conduct in light of all the circumstances." *Alvarado*, 662 N.W.2d at 357.

Additionally, Balistrieri's claim that King was negligent for permitting Nahulak to enter the restroom or speak to him also involves a factual dispute. Nahulak testified that he did not believe he ever entered the restroom and that his conversation with King, which Balistrieri states he overheard, occurred outside the restroom area. (Yakala Aff. Ex. B at 23). King also testified that Nahulak never entered the restroom. (King Dep. 60.) Hence, this claim remains unresolved.

30

Nevertheless, EDS argues that this court should bar Balistrieri's claims based on public policy concerns. Public policy considerations that may preclude liability include the following:

> (1) the injury is too remote from the negligence; (2) the injury is too wholly out of proportion to the tortfeasor's culpability; (3) in retrospect it appears too highly extraordinary that the negligence should have resulted in the harm; (4) allowing recovery would place too unreasonable a burden on the tortfeasor; (5) allowing recovery would be too likely to open the way for fraudulent claims; [or] (6) allowing recovery would enter a field that has no sensible or just stopping point.

*Gritzner*, 2000 WI 68, ¶ 21 235 Wis. 2d 781, ¶ 21, 611 N.W.2d 906, ¶ 21. However, in most cases, "the better practice is to submit the case to the jury before determining whether the public policy considerations preclude liability. Only in those cases where the facts are simple to ascertain and the public policy questions have been fully presented may a court review public policy and preclude liability before trial." *Alvarado*, 2003 WI 55, ¶ 17-18, 262 Wis. 2d 74, ¶ 17-18, 662 N.W.2d 350, ¶ 17-18.

In support of its public policy argument, EDS asserts that (1) Balistrieri's claims primarily concern UPR's conduct and that it would be unreasonable to hold EDS liable for discriminatory actions by UPR related to Balistrieri's condition; (2) the injury is out of proportion to EDS's culpability; (3) the alleged negligent conduct is too remote to cause his injuries; and (4) allowing recovery would place an unreasonable burden on EDS. In response, Balistrieri maintains that public policy favors holding EDS liable as the risk of harm in not following the federal regulations is significant.

As mentioned earlier, there are factual disputes that are material to Balistrieri's negligence claims. Wisconsin law favors "a full factual resolution before application of a

31

public policy analysis," *Alvarado*, 2003 WI 55, ¶ 20, 262 Wis. 2d 74, ¶ 20, 662 N.W.2d 350, ¶ 20, and, therefore, EDS's request that this court limit its liability at this stage of the proceedings must be rejected.

To sum up, EDS is entitled to summary judgment with respect to the claims that EDS was negligent in (1) failing to monitor Balistrieri during the testing process; (2) failing to begin the three-hour testing limit at 10:30 a.m. or failing to inform Balistrieri of the beginning of the three-hour period; (3) continually pressuring Balistrieri to produce a urine sample; and (4) failing to give Balistrieri advice on drinking fluids as raised in Count III.

On the other hand, a different result is as to Balistrieri's remaining assertions. Balistrieri's claims that EDS was negligent with regard to (1) King's presence in the restroom during his attempts to provide a sample; (2) EDS was negligent in permitting a person of the opposite gender to conduct the testing; and (3) EDS was negligent in failing to prevent Balistrieri's supervisor from talking to Balistrieri during testing. The parties remain at odds respecting these matters, and therefore a jury will have to decide what occurred as well as the reasonableness of EDS's conduct under the circumstances.

Further, because many of the grounds asserted by Balistrieri's in support of his negligence claim against EDS are included in his claim of negligence against UPR (Count II), the court will grant UPR's motion for summary judgment in part and deny it in part for the reason discussed above.

Therefore,

IT IS ORDERED that UPR's Motion for Summary Judgment as to Count I of the Amended Complaint is granted and Balistrieri's Americans with Disabilities Act claim is dismissed.

IT IS FURTHER ORDERED that UPR's Motion for Summary Judgment as to Count II of the Amended Complaint is granted in part and denied in part.

IT IS FURTHER ORDERED that UPR's Motion for Summary Judgment as to Counts IV, V, and VI of the Amended Complaint is denied.

IT IS FURTHER ORDERED that EDS's Motion for Summary Judgment is granted in part and denied in part.

Dated at Milwaukee, Wisconsin, this 31st day of March, 2008.

BY THE COURT

s/ C. N. CLEVERT, JR.
C. N. CLEVERT, JR.
U. S. DISTRICT JUDGE